## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CRUM & FORSTER SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| V. | ) ) | Case No.: |
| EZ BLOCKCHAIN LLC and MINEFFICIENCY LLC, | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Crum & Forster Specialty Insurance Company ("CFSIC"), by and through its undersigned counsel, as and for its Complaint for Declaratory Judgment against Defendant EZ Blockchain LLC ("EZB") and Minefficiency LLC ("Minefficiency"), states as follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201. In this action, CFSIC seeks a determination of its rights and obligations under insurance policies issued to EZB in connection with a Demand for Arbitration filed by Minefficiency, which asserts certain claims against EZB.

## JURISDICTION AND VENUE

2.      This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), as this action is between citizens of different states and the amount in controversy exceeds $75,000.

4.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b), as Defendant EZB resides in this district.

5.     Plaintiff CFSIC is a Delaware corporation with a statutory home in Delaware and an administrative office in Morristown, New Jersey. At all relevant times, CFSIC conducted business in the State of Illinois.

6.     Therefore, Plaintiff CFSIC is a citizen of Delaware and New Jersey for purposes of diversity jurisdiction.

7.     Upon information and belief, the members of Defendant EZB are two individuals, Sergii Gerasymovych and Vladimir Rodinoff.  Upon information and belief, Mr. Gerasymovych is domiciled in Illinois and Mr. Rodinoff is domiciled in Florida.  Therefore, for purposes of diversity jurisdiction, Defendant EZB is a citizen of Illinois and Florida.

8.     Upon information and belief, Defendant Minefficiency's sole member is J. Global Energy Holdings, Inc.  J. Global Energy Holdings, Inc. is a corporation incorporated under the laws of state of Texas and, upon information and belief, its principal place of business is located in Houston, Texas.  Therefore, for purposes of diversity jurisdiction, Defendant Minefficiency is a citizen of Texas.

9.     The Underlying Arbitration (as defined herein) is pending with the American Arbitration Association in Houston, Texas.

10.     CFSIC issued a commercial general liability ("CGL") policy and an excess liability insurance policy to Defendant EZB, as described more fully below.

11.     The scope of the coverage available to EZB is governed by the terms, conditions, and exclusions of the policies.

12.     Plaintiff CFSIC does not assert any claim against Defendant Minefficiency in this Complaint and Defendant Minefficiency has been named as a defendant in this action solely as a necessary party.

## THE UNDERLYING ARBITRATION

13.     On July 8, 2022, Minefficiency filed a Demand for Arbitration against EZB (the "Demand") with the American Arbitration Association, Case No. 01-22-0003-9022 (the "Underlying Arbitration").  A true and correct copy of the Demand is attached hereto as Exhibit A.

14.     The Demand alleges that, in late 2021, Minefficiency, a cryptocurrency mining company, contracted to purchase three data centers, or "pods" from EZB, which were represented by EZB as being able to provide the necessary infrastructure to run Minefficiency's miners.  Ex. A at ¶ 2.

15.     The Demand further alleges that, in September 2021, Minefficiency engaged with Duvera Solucoes Em Tecnologia LTDA ("Duvera"), a consulting company specializing in implementing and supporting IT systems of cryptocurrency mining, to assist, *inter alia*, in purchasing data centers to house and run Minefficiency's miners.  Ex. A at ¶ 14.

16.     The Demand further alleges that EZB manufactures and sells such mobile data centers, which are heavily modified shipping containers or "pods," that are purportedly equipped with all the physical, electrical, and networking infrastructure necessary to safely and efficiently run miners such as the ones owned by Minefficiency. Ex. A at ¶ 15.

17.     The Demand further alleges that the pods purportedly contain ventilation equipment sufficient to prevent overheating of both the miners and of the pods themselves. Ex. A at ¶ 15.

18.     The Demand alleges that Duvera, as Minefficiency's designated representative, contacted EZB to discuss purchasing EZB's pods. The Demand further alleges that Duvera communicated the type and number of Minefficiency's miners to EZB, and sought guidance from EZB regarding how many pods Minefficiency would need, and which of EZB's products would be

appropriate for Mineficiency's purposes. The Demand further alleges that Duvera informed EZB that Mineficiency needed housing and support for its 2,304 miners of the type "2.240 S19J Pro." Ex. A at ¶ 16.

19.     The Demand further alleges that EZB informed Mineficiency (through Duvera) that, to support its miners, Mineficiency should purchase three of EZB's Smartbox 3000 data centers or pods, and that each pod would house 768 miners, providing a total capacity of 2,304 miners in the three pods.  Ex. A at ¶ 17.

20.     The Demand further alleges that Mineficiency and EZB entered into a November 12, 2021 sales agreement (the "Sales Agreement"), pursuant to which Mineficiency contracted to purchase three Smartbox 3000 data centers (or pods) "with electrical capacity up to 3000 kW with 768 x C19 miner slots" to house and run its miners.  Ex. A at ¶ 18.

21.     The Demand further alleges that the purchase price in the Sales Agreement for the three pods was $765,000 ($255,000 per pod). Ex. A at ¶ 19.

22.     The Demand alleges that after the Sales Agreement was final and payment was made, the pods were delivered in March 2022.  Ex. A at ¶ 21.

23.     The Demand further alleges that, soon after the pods were delivered, it became apparent that they were deficient in several aspects. The Demand alleges that the pods did not fit 768 miners per pod as stated in the Sales Agreement and, instead, each pod could only fit 600 miners – 168 less than the stated capacity.  The Demand further alleges that, as a result, Mineficiency had 504 miners that were unable to be housed in the pods and, therefore, unable to be operated. Ex. A at ¶ 22.

24.     The Demand further alleges that the pods' ventilation mechanisms were not adequate for their intended purposes. Specifically, the Demand alleges the pods overheat and/or

cause the miners to overheat, even when used exactly as intended per the product specifications. Ex. A at ¶ 23.

25.     The Demand further alleges that the pods were physically damaged, had wiring issues, and were missing several promised pieces of equipment. Ex. A at ¶ 24.

26.     The Demand alleges that an inspection report, dated March 14, 2022, detailed additional problems with the pods, including the following:

   a) one pod was dented and had a defective, deformed lower door latch which needed to be replaced;

   b) several of the pod doors were extremely difficult to open and required an impact driver to open;

   c) some of the breakers were not part of the standard equipment library, none of the breakers were listed per American National Standard Institute/Underwriters Laboratories standards, and at least one breaker did not satisfy operating requirements;

   d) the pods were missing certain network equipment, operation centers, cables, switches, and CCTVs;

   e) the color scheme within the pods was not in line with American electrical standards;

   f) the burnished bus bars were not set up to accept 2-hole lugs as specified;

   g) there was significant corrosion on some of the hardware making electrical connections, as well as some rusting;

   h) the data cable entry into the pods was not located where anticipated;

   i) the wiring in one of the pods was not properly trained through the cable tray and there was significant damage to at least one phase conduct cable, which needed to be replaced; many screws were protruding into the cable tray, causing damage; and

   j) there appeared to be one shared neutral conductor per pair of breakers and the grounding scheme appeared to combine ground and neutral conductors, with both roles accomplished through a single wife; the shared neutral and combination of ground and neutral wires resulted in ground fault protection being exceedingly costly and complex to property employ.

Ex. A at ¶ 25.

27.     The Demand alleges that EZB breached its obligations under the Sales Agreement by failing to deliver pods to Minefficiency which conformed with the specifications of the Sales Agreement and by failing to repair or replace such non-conforming goods as required under the Sales Agreement. Ex. A at ¶ 34.

28.     The Demand further alleges that EZB breached express and implied warranties to Minefficiency by delivering pods that were not in good working order, were not free from material defects and did not have the capacity to perform as stated in the Sales Agreement. Ex. A at ¶ 47.

29.     The Demand further alleges that EZB made false statements about the Smartbox 3000 pods in the Purchase Agreement, and that EZB knew or should have known that such statements were false.  Ex. A at ¶ 35.

30.     The Demand further alleges that EZB willfully engaged in deceptive trade practices by misrepresenting the capacity, characteristics, standards and quality of the pods, both in negotiations and in the Sales Agreement, with the intention to induce Minefficiency to enter into the Sales Agreement and purchase the pods from EZB.  Ex. A at ¶¶ 65, 70.

31.     The Demand further alleges that Minefficiency has suffered damages due to the deficient and defective pods, and seeks to recover compensatory damages, lost profits, punitive, exemplary, and all other damages to which it is entitled. The Demand states that Minefficiency seeks to recover all of the fees, costs and expenses incurred in remedying the defective pods, as well as all fees, costs and expenses incurred in this arbitration. Ex. A at ¶¶ 37-38.

32.     The Demand asserts the following causes of action against EZB:  Breach of Contract (Count I); Breach of Express Warranty (Count II); Breach of Implied Warranty of Merchantability (Count III); Breach of Implied Warranty of Fitness for a Particular Purpose (Count

VI); Violation of Delaware Deception Trade Practices Act (Count V); Violation of Delaware Consumer Fraud Act (Count VI); Common Law Fraud (Count VII); Fraud Inducement to Contract (Count VIII); and Negligent Misrepresentation (Count IX).

## THE POLICIES

### A. The CGL Policy

33.    CFSIC issued policy No. GLO0083293 the ("Policy") to named insured EZ Blockchain, LLC, effective from August 27, 2021 to August 18, 2022.   A true and correct certified copy of the Policy is attached hereto as Exhibit B.

34.    The Policy provides a $1,000,000 Each Occurrence and $2,000,000 General Aggregate limit of liability.  Ex. B at p. 10.

35.    Coverage A under the Commercial General Liability Coverage Part of the Policy provides, in pertinent part, as follows:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE**

**1. Insuring Agreement**

    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But: […]

***

    **b.** This insurance applies to "bodily injury" and "property damage" only if:

       (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; […]

***

Ex. B at p. 15.

36.     Coverage A under the Commercial General Liability Part of the Policy includes exclusion **k. Damage To Your Product**, which precludes coverage for "'[p]roperty damage' to 'your product' arising out of it or any part of it." Ex. B at p. 19.

37.     Coverage A under the Commercial General Liability Part of the Policy also includes exclusion **m. Damage To Impaired Property Or Property Not Physically Injured**, which precludes coverage for the following:

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> **(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> **(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

Ex. B at p. 19.

38.     **SECTION V – DEFINITIONS** of the Policy includes the following relevant definitions:

***

> **8.**     "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
> **a.**     It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous or;
>
> **b.**     You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

***

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

***

17. "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. […]

***

21. "Your Product":

    **a.** Means:

        **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            **(a)** You;
            **(b)** Others trading under your name; or
            **(c)** A person or organization whose business or assets you have acquired; and

        **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    **b.** Includes:

        **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

        **(2)** The providing of or failure to provide warnings or instructions.

    **c.**    Does not include vending machines or other property rented to or located for the use others but not sold.

***

Ex. B at pp. 27-30.

**B.**  **The Excess Policy**

39.    CFSIC also issued Excess Liability Policy No. SEO-115029 to named insured EZ Blockchain LLC, effective from August 27, 2021 to August 18, 2022 (the "Excess Policy"). A true and accurate copy of the Excess Policy is attached hereto as Exhibit C.

40.    The Excess Policy is subject to limits of liability of $3 million per Occurrence and in the Aggregate, as amended by Endorsement No. 3. Ex. C at p. 26.

41.    The Insuring Agreement of the Excess Policy provides, in pertinent part, as follows:

**SECTION I- COVERAGES**

**1.**  **Insuring Agreement**

    **a.**    We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "injury or damage" to which this insurance applies.

    We will have the right and duty to defend the insured against any "suit" seeking damages for such "injury or damage" when the "retained limit" has been paid in full. When we have no duty to defend, we will have the right to defend, or to associate in the defense of, the insured against any "suit" seeking damages for "injury or damage".

    However, we will have no duty to defend the insured against any "suit" seeking damages for which insurance under this Policy does not apply. At our discretion, we may investigate any "event" that may involve this insurance and settle any resultant claim or "suit".

    But:

    **(1)** The amount we will pay for "ultimate net loss" is limited as described in **SECTION II -- LIMITS OF INSURANCE**; and

10

**(2)** Our right and duty to defend ends when we have paid the applicable limit of insurance in the payment of judgments or settlements under this Policy. However, if the policy of "controlling underlying insurance" specifies that limits are reduced by defense expenses, our right and duty to defend ends when we have paid the applicable limit of insurance in the payment of defense expenses, judgments, or settlements under this Policy.

**b.** The insurance under this Policy will follow the same provisions, exclusions, conditions and limitations that are contained in the applicable "controlling underlying insurance", unless otherwise directed by this Policy. To the extent such provisions differ or conflict, the provisions of this Policy will apply. However, the coverage under this Policy will not be broader than that provided by any "underlying insurance".

\*\*\*

Ex. C at p. 7.

42. **SECTION III – CONDITIONS** of the Excess Policy includes the following relevant provision:

**9. Loss Payable**

Liability under this Policy does not apply to a given claim unless and until the insured or insured's "underlying insurer" has become obligated to pay the "retained limit", and the obligation of the insured to pay the "ultimate net loss" in excess of the "retained limit" has been determined by a final settlement or judgment or written agreement among the insured, claimant, "underlying insurer" (or a representative of one or more of these) and us.

\*\*\*

Ex. C at p. 11.

43. **SECTION IV – DEFINITIONS** of the Excess Policy includes the following relevant definitions:

**1. "Controlling underlying insurance"** means a policy of insurance listed in the Schedule of Underlying Insurance and identified as "controlling underlying insurance".

\*\*\*

2. **"Injury or damage"** means any injury or damage covered in the applicable "controlling underlying insurance" arising from an "event"

11

***

5. **"Retained limit"** means the sum of all applicable "underlying insurance" shown in the Schedule of Underlying Insurance and any other insurance or self-insurance applicable to the claim or "suit", except insurance specifically written to apply in excess of this Policy.

***

8. **"Underlying insurance"** means the policy or policies (including any renewal or replacement of such policies) of insurance listed in the Schedule of Underlying Insurance including the "controlling underlying insurance" and any self-insured retentions.

9. **"Underlying insurer"** means any insurer that provides a policy of insurance listed in the Schedule of Underlying Insurance.

***

Ex. C at p. 13.

44. The Schedule of Underlying Insurance in the Excess Policy identifies, in pertinent part, the CGL Policy (CFSIC Policy No. GLO-083293) as "controlling underlying insurance". Ex. C at p. 3.

## **THIS DISPUTE**

45. CFSIC received notice that coverage is sought under the CGL Policy and the Excess Policy (collectively, the "Policies") in connection with the claims asserted against EZB in the Demand filed in the Underlying Arbitration.

46. CFSIC has determined through its coverage investigation that it owes no obligation to defend or indemnify EZB in connection with the claims asserted against it in the Demand filed in the Underlying Arbitration.

47. CFSIC has advised EZB in writing that it disclaims any obligation under the Policies to provide it a defense to or indemnify EZB in connection with the claims asserted in the Demand filed in the Underlying Arbitration.

48.     CFSIC now brings this action to obtain a judicial declaration that the Policies provide no defense or indemnity obligations to EZB in connection with the claims asserted against it in the Demand filed in the Underlying Arbitration.

## COUNT I

### (No Duty to Defend or Indemnify Under the CGL Policy – the Demand Does Not Satisfy the Insuring Agreement of Coverage A of the CGL Part of the Policy)

49.     CFSIC incorporates by reference herein paragraphs 1 through 48, as if the same were fully set forth at length.

50.     The Insuring Agreement of Coverage A – Bodily Injury and Property Damage Liability of the Commercial General Liability Part of the CGL Policy provides, in pertinent part, that "[CFSIC] will pay those sums that the insured becomes legally obligated to pay as damages because of … 'property damage' to which this insurance applies. However, we will have no duty to defend the insured against any 'suit' seeking damages for … 'property damage' to which this insurance does not apply."  The Insuring Agreement of Coverage A further provides, in pertinent part, that "this insurance applies to … 'property damage' only if . . . [t]he … 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'. . ."  Ex. B at p. 15.

51.     The CGL Policy defines "property damage" to mean "[p]hysical injury to tangible property, including all resulting loss of use of that property," and "[l]oss of use of tangible property that is not physically injured."  Ex. B at p. 29.  The CGL Policy defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Ex. B at p. 29.

52.     The Demand does not allege that Minefficiency sustained "property damage" which was caused by an "occurrence", as that term is defined under the CGL Policy. Specifically, the Demand alleges that:

a)  EZB breached its obligations under the Sales Agreement by failing to deliver pods to Minefficiency which conformed with the specifications of the Sales Agreement and by failing to repair or replace such non-conforming goods as required under the Sales Agreement (Ex. A at ¶ 34);

b)  EZB breached express and implied warranties to Minefficiency by delivering pods that were not in good working order, were not free from material defects and did not have the capacity to perform as stated in the Sales Agreement (Ex. A at ¶ 47);

c)  EZB made false statements about the Smartbox 3000 pods in the Purchase Agreement, and that EZB knew or should have known that such statements were false (Ex. A at ¶ 35); and

d)  EZB willfully engaged in deceptive trade practices by misrepresenting the capacity, characteristics, standards and quality of the pods both in negotiations and in the Sales Agreement with the intention to induce Minefficiency to enter into the Sales Agreement and purchase the pods from EZB

Ex. A at ¶¶ 65, 70.

53.     The Demand does not allege that Minefficiency sustained "property damage" which was caused by an "accident" and, therefore, does not seek to impose liability against EZB for "property damage" caused by an "occurrence" as those terms are defined in the CGL Policy.

54. Accordingly, because the Demand for Arbitration does not allege that EZB is liable for "property damage" caused by an "occurrence" as defined by the CGL Policy, the claims asserted against EZB in the Demand do not fall within the scope of the Insuring Agreement of Coverage A of the Commercial General Liability Coverage Part of the CGL Policy and, therefore, no coverage is afforded under Coverage A of the CGL Policy to EZB for the claims asserted against it in the Demand for Arbitration.

## COUNT II

### (No Duty to Defend or Indemnify Under the CGL Policy – Exclusion m Precludes Coverage)

55. CFSIC incorporates by reference herein paragraphs 1 through 54, as if the same were fully set forth at length.

56. Coverage A of the CGL Policy contains exclusion m. Damage To Impaired Property or Property Not Physically Injured which precludes coverage for "'property damage' to … property that has not been physically injured, arising out of: . . .[a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work; or . . . [a] delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms." Ex. B at p. 19.

57. The Demand alleges that the pods EZB sold to Minefficency could not be properly used because of several deficiencies and/or inadequacies in the pods. Specifically, the Demand alleges that the pods did not fit 768 miners per pod as stated in the Sales Agreement and, instead, each pod could only fit 600 miners – 168 less than the stated capacity. The Demand further alleges that, as a result, Minefficency had 504 miners that were unable to be housed in the pods and, therefore, unable to be operated. Ex. A at ¶ 22.

58.     The Demand does not allege that the 504 miners that were unable to be operated because the pods did not conform to the specifications contained in the Sales Agreement were "physically injured" as a result of the alleged deficiencies in EZB's pods.

59.     Accordingly, even if the allegations of the Demand could reasonably be interpreted as satisfying the requirements of coverage under the Insuring Agreement of Coverage A of the CGL Policy, coverage for the claims asserted against EZB in the Demand would be precluded by the operation of exclusion m. Damage To Impaired Property or Property Not Physically Injured contained in Coverage A of the CGL Policy.

## COUNT III

### (No Duty to Defend or Indemnify Under the CGL Policy – Exclusion k Precludes Coverage)

60.     CFSIC incorporates by reference herein paragraphs 1 through 59, as if the same were fully set forth at length.

61.     Coverage A of the CGL Policy contains exclusion k. Damage To Your Product which precludes coverage for "'property damage' to 'your product' arising out of it or any part of it."  Ex. B at p. 19.

62.     The CGL Policy defines "your product" to mean "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by: [EZB] …" and includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product'."  Ex. B at p. 30.

63.     The Demand alleges that when the pods EZB provided to Minefficency pursuant to the Sales Agreement were delivered, the pods were physically damaged, had wiring issues, and were missing several promised pieces of equipment. The Demand further alleges that

Minefficiency has suffered damages due to the deficient and defective pods which pods EZB provided to Minefficiency pursuant to the Sales Agreement. Ex. A at ¶¶ 24, 34.

64.     Accordingly, even if the allegations of the Demand could reasonably be interpreted as satisfying the requirements of coverage under the Insuring Agreement of Coverage A of the CGL Policy, coverage for the claims asserted against EZB in the Demand would be precluded by the operation of exclusion k. Damage To Your Product contained in Coverage A of the CGL Policy.

## COUNT IV

## (No Coverage Obligations Owed Under the Excess Policy)

65.     CFSIC incorporates by reference herein paragraphs 1 through 64, as if the same were fully set forth at length.

66.     The Insuring Agreement of the Excess Policy provides, in pertinent part, that "[CFSIC] will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "injury or damage" to which this insurance applies . . . We will have the right and duty to defend the insured against any "suit" seeking damages for such "injury or damage" when the "retained limit" has been paid in full  . . . However, we will have no duty to defend the insured against any "suit" seeking damages for which insurance under this Policy does not apply.  Ex. C at p. 7.

67.     The Loss Payable Condition of the Excess Policy provides, in pertinent part, that "[l]iability under this Policy does not apply to a given claim unless and until the insured or insured's 'underlying insurer' has become obligated to pay the 'retained limit', and the obligation of the insured to pay the 'ultimate net loss' in excess of the 'retained limit' has been determined by a

final settlement or judgment or written agreement among the insured, claimant, 'underlying insurer' (or a representative of one or more of these) and us." Ex. C at p. 11.

68.     The Excess Policy defines "retained limit" to mean "the sum of all applicable 'underlying insurance' shown in the Schedule of Underlying Insurance and any other insurance or self-insurance applicable to the claim or 'suit', except insurance specifically written to apply in excess of this Policy."   Ex. C at p. 13.

69.     The Excess Policy further defines "Underlying insurance" to mean the policy or policies (including any renewal or replacement of such policies) of insurance listed in the Schedule of Underlying Insurance including the "controlling underlying insurance" and any self-insured retentions.   Ex. C at p. 13.

70.     The Schedule of Underlying Insurance in the Excess Policy identifies the CGL Policy as the "controlling underlying insurance". Ex. C at p. 3.

71.     Neither EZB nor CFSIC has become obligated to pay the applicable limits of the CGL Policy in connection with the claims which are the subject of the Demand for Arbitration or any other claims.

72.     As a result, liability under the Excess Policy does not apply to the claims which are the subject of the Demand for Arbitration because neither EZB nor CFSIC has become obligated to pay the 'retained limit' of the Excess Policy.

73.     Accordingly, CFSIC owes no present duties under the Excess Policy to defend or indemnify EZB for the claims asserted against it in the Demand for Arbitration.

74.     Moreover, even if it could be reasonably determined that either EZB or CFSIC has become obligated to pay the 'retained limit' of the Excess Policy, coverage for the claims asserted

against EZB in the Demand for Arbitration would be excluded by operation of certain terms and exclusions contained in the CGL Policy which are incorporated into the Excess Policy.

75. The Insuring Agreement of the Excess Policy provides: "The insurance under this Policy will follow the same provisions, exclusions, conditions and limitations that are contained in the applicable 'controlling underlying insurance', unless otherwise directed by this Policy. To the extent such provisions differ or conflict, the provisions of this Policy will apply. However, the coverage under this Policy will not be broader than that provided by any 'underlying insurance'." Ex. C at p. 7.

76. The Schedule of Underlying Insurance in the Excess Policy identifies, in pertinent part, the CGL Policy (CFSIC Policy No. GLO-083293) as "controlling underlying insurance". Ex. C at p. 3.

77. Accordingly, even if it could be reasonably determined that either EZB or CFSIC has become obligated to pay the 'retained limit' of the Excess Policy, liability under the Excess Policy for the claims asserted against EZB in the Demand for Arbitration would not apply for the following reasons:

   a) the claims asserted against EZB in the Demand for Arbitration do not fall within the scope of the Insuring Agreement of Coverage A of the Commercial General Liability Coverage Part of the CGL Policy because the Demand does not allege that EZB is liable for "property damage" caused by an "occurrence" as defined by the CGL Policy and incorporated in the Excess Policy;

   b) coverage for the claims asserted against EZB in the Demand for Arbitration would be precluded by the operation of exclusion m. Damage To Impaired Property or Property

Not Physically Injured contained in the CGL Policy, as incorporated in the Excess Policy;

c) coverage for the claims asserted against EZB in the Demand for Arbitration would be precluded by the operation of exclusion k. Damage To Your Product contained in the CGL Policy, as incorporated in the Excess Policy.

## PRAYER FOR RELIEF

Plaintiff Crum & Forster Specialty Insurance Company hereby respectfully requests the entry of an order and judgment in its favor and against Defendants EZ Blockchain LLC and Minefficiency LLC, declaring as follows:

a. This court has jurisdiction over the parties and the subject matter of this litigation;

b. The Policies do not provide coverage to EZ Blockchain LLC for the claims asserted against it in the Demand filed in the Underlying Arbitration;

c. Crum & Forster Specialty Insurance Company does not owe a duty under the Policies to defend or reimburse defense costs incurred by Defendant EZ Blockchain LLC in connection with the claims asserted against it in the Demand filed in the Underlying Arbitration;

d. Crum & Forster Specialty Insurance Company does not owe a duty under the Policies to indemnify Defendant EZ Blockchain LLC in connection with the claims asserted against it in the Demand filed in the Underlying Arbitration;

e. Crum & Forster Specialty Insurance Company is entitled to an award of its costs; and

f. Such other further relief as this Court deems just and appropriate.

Dated: January 13, 2023

Respectfully Submitted,

CRUM & FORSTER SPECIALTY INSURANCE COMPANY

By: s/James J. Hickey

James J. Hickey
One of the Attorneys for Plaintiff
Crum & Forster Specialty Insurance Company
James J. Hickey (Illinois Bar No. 6198334)
James.Hickey@kennedyslaw.com
Julie Klein (Illinois Bar No. 6316842)
Julie.Klein@kennedyslaw.com
KENNEDYS CMK
30 South Wacker, Suite 3650
Chicago, IL 60606
Phone: (312) 800-5000
Fax: (312) 207-2110